# Illinois Official Reports

## Supreme Court

---

### *People v. Griffin*, 2024 IL 128587

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. SHAMAR GRIFFIN, Appellee. |
| Docket No. | 128587 |
| Filed | March 21, 2024 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Michael B. McHale, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part. Cause remanded with directions. |
| Counsel on Appeal | Kwame Raoul, Attorney General, of Springfield (Jane Elinor Notz, Solicitor General, and Katherine M. Doersch and Erin M. O'Connell, Assistant Attorneys General, of Chicago, of counsel), for the People. |
| | James E. Chadd, State Appellate Defender, Douglas R. Hoff, Deputy Defender, and Rachel M. Kindstrand, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee. |

Justices                    JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.

Justices Neville, Overstreet, Cunningham, Rochford, and O'Brien concurred in the judgment and opinion.

Chief Justice Theis dissented, with opinion.

## OPINION

¶ 1        Pursuant to a fully negotiated guilty plea agreement, petitioner, Shamar Griffin, pleaded guilty in the circuit court of Cook County to one count of first degree murder in exchange for a 35-year sentence and the dismissal of additional charges. Years later, petitioner filed a motion for leave to file a successive postconviction petition, pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), alleging he was actually innocent and that his attorney failed to investigate his case before steering him to the plea agreement. The circuit court denied the motion for leave to file after finding that petitioner's guilty plea precluded his actual innocence claim. On appeal the appellate court reversed, finding, under this court's decision in *People v. Reed*, 2020 IL 124940, petitioner was permitted to file a petition alleging actual innocence despite his guilty plea. 2022 IL App (1st) 191101-B, ¶ 46. The appellate court further determined that under this court's decision in *People v. Robinson*, 2020 IL 123849, petitioner made a colorable claim of actual innocence and the circuit court should have granted his motion for leave to file a successive postconviction petition. 2022 IL App (1st) 191101-B, ¶ 66. The appellate court remanded petitioner's entire petition without review of his ineffective assistance of counsel claim. *Id.* ¶ 68. At the request of the State, we granted leave to appeal.

¶ 2        The issues raised in this appeal are whether (1) the standard applied to an actual-innocence claim at the leave-to-file stage differs based on whether the petitioner was convicted following a trial or he pleaded guilty and (2) each claim in a successive petition must meet the applicable standard to proceed to second-stage postconviction proceedings. We hold that, in determining whether to grant leave to file a successive postconviction petition based on an actual innocence claim, the same standard applies to all petitioners. We further hold that each claim in a successive postconviction petition must meet the applicable standard in order to advance to second-stage postconviction proceedings. Accordingly, we affirm the appellate court in part, reverse in part, and remand for further proceedings.

¶ 3                              I. BACKGROUND

¶ 4        In 2010, petitioner was indicted on 24 counts of first degree murder for the shooting death of Milissa[1] Williams. 720 ILCS 5/9-1(a)(1) (West 2010). Petitioner was also indicted on four counts of attempted murder and one count of aggravated battery with a firearm in the shooting of Otis Houston.

_____

[1]The record on appeal includes documents in which the victim's first name was spelled both "Milissa" and "Millisa." We use the spelling used by the appellate court.

¶ 5                               A. Guilty Plea Proceedings

¶ 6         In June 2011, defense counsel informed the circuit court that the parties had an agreement where petitioner would plead guilty to one count of first degree murder in exchange for a 35-year sentence and the dismissal of the additional charges. The court admonished petitioner regarding the consequences of a guilty plea. The court also asked petitioner if he had been threatened or promised anything to induce his guilty plea, and he answered "No, Sir."

¶ 7         The State presented the factual basis for the plea agreement, stating that if the case went to trial, the evidence would show that petitioner shot Williams twice with a handgun and then chased Houston down and shot him four times. Houston would testify that he saw petitioner engage in these acts, identified petitioner in a lineup as the shooter, and would identify petitioner at trial.

¶ 8         The State proffered the grand jury testimony of Lavertice Harmon, who would testify he was on North LeClaire Avenue in Chicago with Leroy Battle, Terrence Washington, Kevin Barnes, and others around 3 a.m. on the date of the shooting. Harmon observed a dark-colored, four-door vehicle with its headlights off drive south on LeClaire Avenue from Le Moyne Street. When the car pulled up to Harmon, he recognized the driver as petitioner, whom he had known for 10 years. Petitioner called Harmon over to the car, and Harmon saw a chrome-colored handgun with a black handle in petitioner's lap, wrapped in a bandana. Harmon would testify that petitioner stated he was "fixin' to merk that b***," referring to Milissa Williams, because she had stabbed petitioner in the past. Harmon knew "merk" meant to kill. Harmon asked petitioner to wait so he could warn his friends to get off the street to avoid getting hurt. Petitioner agreed and told Harmon he would drive around the block.

¶ 9         After petitioner left, Harmon went to Williams and Houston and told them to leave the area. Williams was initially reluctant to leave, but she agreed to leave and started to walk toward a park with Harmon and Houston. As they were walking, Harmon spotted the car petitioner was driving and then saw him get out. Petitioner and Williams had a brief conversation that Harmon could not hear; then petitioner took out his gun and shot Williams once. Houston fled, and petitioner chased him and fired multiple shots at him. Harmon reported that petitioner went back to Williams and fired an additional shot at her; she fell to the ground. Petitioner then ran back to the car and drove away.

¶ 10        The State also presented grand jury testimony from Leroy Battle and Kevin Barnes. Both witnesses knew petitioner and would identify him as the shooter. The State next presented the grand jury testimony of Carlton Winters, to whom petitioner admitted he was the shooter. Finally, the State proffered the report from the medical examiner, which indicated Williams died from multiple gunshot wounds. Defense counsel stipulated to the State's proposed evidence. Petitioner's statement to the police—in which he admitted he shot Williams—was not included in the State's factual basis for the plea.

¶ 11        The circuit court accepted petitioner's plea and sentenced him to 35 years in prison pursuant to the plea agreement. The court admonished petitioner that, if he wished to appeal, he needed to file a motion to withdraw his guilty plea within 30 days. Petitioner failed to file a motion to withdraw his plea within 30 days, but he did file a notice of appeal. The court rejected the notice of appeal as untimely and noted that petitioner could seek leave to file a late notice of appeal from the appellate court. Petitioner sought leave to file a late notice of appeal, which was granted.

¶ 12    On appeal, the appellate court granted an agreed motion for summary remand and directed the clerk of the circuit court to modify certain monetary assessments imposed against petitioner. *People v. Griffin*, No. 1-11-3210 (2012) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 13                        B. Initial Postconviction Petition

¶ 14    In September 2017, while his direct appeal was pending, petitioner filed an initial postconviction petition raising a claim of actual innocence based on newly discovered evidence. Petitioner alleged his confession should have been suppressed because the police officers who arrested him did so based on an investigative alert. He also alleged mistreatment while in police custody where for 30 hours he "was threatened and forced to confess." Petitioner alleged his claim was newly discovered because he did not previously know he was not arrested based on an arrest warrant. Finally, petitioner claimed his attorney was ineffective because he failed to investigate petitioner's illegal arrest and determine it was not pursuant to an arrest warrant.

¶ 15    The circuit court summarily dismissed the petition as frivolous and patently without merit. On appeal, appellate counsel filed a motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). The court granted the motion, as "there [were] no issues of arguable merit to be pursued on appeal." *People v. Griffin*, No. 1-18-0490 (2020) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 16                        C. Motion for Leave to File a Successive
                               Postconviction Petition

¶ 17    In February 2019, petitioner sought leave to file a successive postconviction petition. Petitioner alleged he had cause for not bringing the claims in the successive petition earlier because he was unaware that Perrier Myles and Lavonte Moore had information regarding his case until all three men were incarcerated at the same facility. Petitioner further alleged he did not know that Detectives John Folino and Tim McDermott had multiple lawsuits against them until he filed a Freedom of Information Act request. See 5 ILCS 140/1 *et seq.* (West 2016). Petitioner argued he was prejudiced because the claims in his successive petition "so infected [the] judgement [*sic*] of [his] conviction that [his] conviction or sentence violated due process under actual innocence."

¶ 18    Petitioner raised two claims in his successive petition. First, he alleged plea counsel was ineffective for failing to investigate Jerrell Butler as an alternate suspect. Petitioner claimed he informed counsel that, while he was in jail pending trial, he heard "around the jail" that Butler was the person who killed Williams. Counsel responded that, because of petitioner's confession, he had no defense that could help him. Petitioner told counsel the confession was false and resulted from duress, psychological abuse, sleep deprivation, and mental coercion while being detained for 30 hours by Folino and McDermott.

¶ 19    Second, petitioner argued he had newly discovered evidence of his actual innocence. Petitioner attached an affidavit from Lavonte Moore, in which Moore averred that he was across from Lafayette Park in Chicago at around 3 a.m. on June 26, 2009. From his position, Moore could see a group of men and one woman standing around the area. Moore then saw a man he recognized as Butler exit an alley. Butler greeted Moore before pulling out a gun and

- 4 -

jogging across the street toward the park. A few seconds later, Moore heard five gunshots and then saw Butler run back past Moore's car and into the alley from which he had emerged. Moore explained he never mentioned what he saw because he was afraid of Butler and his friends. It was not until they were incarcerated together that Moore told petitioner that he witnessed the shooting.

¶ 20    Petitioner also attached an affidavit from Perrier Myles in support of his claim of actual innocence. Myles averred he was incarcerated at the time of the shooting. Upon his release, Myles had a conversation with his friend Cornell McWilliams, who was Milissa Williams's boyfriend, about the shooting. Myles asked McWilliams why petitioner was in prison for Williams's murder. McWilliams responded that petitioner was a scapegoat "so that [Lavertice Harmon] and Kevin [Barnes's] drug business [could] continue without further pressure from Chicago police." Myles stated that McWilliams, Harmon, and Barnes did not see the shooter's face but that he was light skinned with braids. Confused, Myles asked how McWilliams could not distinguish between the shooter and petitioner, who was dark-skinned with dreadlocks. McWilliams explained he identified petitioner because he wanted justice for his girlfriend's murder and "it was known" that Houston and petitioner had a prior conflict. McWilliams added that Harmon and Barnes also falsely identified petitioner as the shooter. A year after the shooting, McWilliams discovered Houston owed Butler money from drug sales, and he believed that Butler was the actual shooter because of that debt. Myles was later incarcerated at the same facility as petitioner in June 2018, and he informed petitioner of his conversation with McWilliams.

¶ 21    As part of his petition, petitioner included what he labeled "Newly Discovered Evidence of Police Misconduct" by Folino and McDermott, listing 11 lawsuits and attaching complaints related to these cases to the petition. On appeal, petitioner made no direct arguments regarding the police misconduct lawsuits. 2022 IL App (1st) 191101-B, ¶ 19.

¶ 22    In April 2019, the circuit court denied petitioner's motion for leave to file his successive petition. Citing *People v. Simmons*, 388 Ill. App. 3d 599 (2009), the court stated, "petitioner cannot make a claim of actual innocence after a proper constitutionally compliant guilty plea." The court did not make any findings as to petitioner's claim of ineffective assistance of counsel.

¶ 23    Petitioner appealed the denial of his motion for leave to file a successive postconviction petition, arguing (1) his actual innocence claim was not barred by his guilty plea and (2) he made a colorable claim of actual innocence based on newly discovered evidence in the form of affidavits demonstrating that Butler was the actual shooter and two witnesses named in the factual basis for his plea provided false statements. 2022 IL App (1st) 191101-B, ¶ 22. Petitioner further argued he established cause and prejudice for his ineffective assistance of counsel claim, which alleged counsel failed to investigate whether Butler was the actual shooter before allowing petitioner to enter a guilty plea. *Id.*

¶ 24    On the actual innocence claim, the appellate court first recognized that the *Simmons* case relied on by the circuit court had been overruled by this court in *Reed*, 2020 IL 124940. 2022 IL App (1st) 191101-B, ¶ 40. After *Reed*, a petitioner could raise a claim of actual innocence based on newly discovered evidence notwithstanding his guilty plea. *Id.* ¶ 46.

¶ 25    The appellate court then addressed the question of what standard a guilty-plea petitioner must meet in order to obtain leave to file a successive postconviction petition. *Id.* ¶ 48. In *Reed*, 2020 IL 124940, ¶ 49, a case on appeal following a third-stage evidentiary hearing, this court

- 5 -

held that "a successful actual innocence claim requires a defendant who pleads guilty to provide new, material, noncumulative evidence that clearly and convincingly demonstrates that a trial would probably result in acquittal." Petitioner argued *Reed*'s "clear and convincing" standard would not be appropriate at the leave-to-file stage because reliability determinations as to the evidence can only be made at the third-stage evidentiary hearing. 2022 IL App (1st) 191101-B, ¶ 51. Instead, petitioner argued the standard set forth in this court's decision in *Robinson* should apply to guilty-plea petitioners at the leave-to-file stage. *Id.* In *Robinson*, 2020 IL 123849, ¶ 44, this court held that "leave of court should be granted where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." The appellate court agreed that the *Robinson* standard was applicable regardless of whether the underlying judgment stemmed from a guilty plea or a trial. 2022 IL App (1st) 191101-B, ¶ 52.

¶ 26    Applying the *Robinson* standard, the appellate court began by accepting the State's concession that the Myles and Moore affidavits constituted new, material, and noncumulative evidence. *Id.* ¶ 60. The court concluded that Moore's affidavit identified Butler as the actual shooter based on Moore's eyewitness account and that his account was bolstered by Myles's affidavit. *Id.* ¶ 62. The court also found the information in Myles's affidavit undermined the veracity of Harmon's and Barnes's grand jury testimony and Harmon's statement to the police. *Id.* ¶ 63. Therefore, the court concluded petitioner presented a colorable claim of actual innocence because the information in the affidavits placed the inculpatory evidence in the record and factual basis in a different light that undermined the court's confidence in the conviction. Thus, petitioner's motion for leave to file a successive petition should have been granted. *Id.* ¶¶ 66-67. The court remanded the petition in its entirety because it held that partial summary dismissals were not permitted under the Act. *Id.* ¶ 68 (citing *People v. Cathey*, 2012 IL 111746, ¶ 34).

¶ 27    We granted the State's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

¶ 28                              II. ANALYSIS

¶ 29    On appeal before this court, the State argues that the appellate court (1) applied the wrong standard in evaluating whether petitioner's motion for leave to file a successive petition sufficiently demonstrated actual innocence and (2) erred by remanding petitioner's successive petition for further proceedings without finding he satisfied the cause-and-prejudice test as to his ineffective assistance of counsel claim.

¶ 30                    A. Successive Postconviction Petitions

¶ 31    Under the Act, any imprisoned person may institute a proceeding asserting there was a substantial denial of his rights under the Constitution of the United States or of the State of Illinois or both in the proceedings that resulted in his conviction. 725 ILCS 5/122-1(a)(1) (West 2018). Any applicable claim not raised in an original or an amended petition is waived. *Id.* § 122-3. Only one postconviction proceeding is contemplated under the Act, and successive petitions may only be filed with leave of the court. *Id.* § 122-1(f); *People v. Edwards*, 2012 IL 111711, ¶ 22.

¶ 32    The bar to successive postconviction petitions is not absolute, and this court has recognized that the bar may be relaxed in two situations. First, the bar will be relaxed if a petitioner can

establish cause and prejudice for not raising the claim in an initial postconviction petition. 725 ILCS 5/122-1(f) (West 2018); *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). A petitioner shows cause by identifying an objective factor that impeded his ability to raise a specific claim during his initial postconviction proceedings. 725 ILCS 5/122-1(f)(1) (West 2018). The petitioner shows prejudice by demonstrating that the claim not raised during his initial postconviction proceedings so infected the trial that the resulting conviction or sentence violated due process. *Id.* § 122-1(f)(2).

¶ 33    The second exception to the bar to successive postconviction petitions applies when allowing the filing of a successive postconviction petition would avert a " 'fundamental miscarriage of justice.' " *Edwards*, 2012 IL 111711, ¶ 23. For this second exception to apply, petitioner must show actual innocence. *Id.* Unlike the first exception, this second exception is not codified in the Act, and the Act is silent on the parameters of its use. However, the exception is well established under Illinois law. *Robinson*, 2020 IL 123849, ¶ 42. We review *de novo* the denial of leave to file a successive postconviction petition alleging actual innocence. *Id.* ¶ 40.

¶ 34                    B. The "Colorable Showing of Actual Innocence" Standard

¶ 35    This court has previously announced that, at the leave-to-file stage, a petitioner seeking to file a successive petition based on actual innocence must make a "colorable claim of actual innocence." *Edwards*, 2012 IL 111711, ¶ 24. When the petitioner relies on new evidence to meet this standard, he must show that the evidence in support of the claim is newly discovered, material, and noncumulative and of such conclusive character that it would probably change the result on retrial. *People v. Washington*, 171 Ill. 2d 475, 489 (1996); *Edwards*, 2012 IL 111711, ¶ 32. We reaffirmed the applicability of this standard in *Robinson*, 2020 IL 123849, ¶ 47. "New" means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. *People v. Coleman*, 2013 IL 113307, ¶ 96. "Material" refers to evidence that is relevant and probative of the petitioner's innocence. *Id.* "Noncumulative" evidence adds to what the jury heard. *Id.* "Conclusive" means the evidence, when considered along with the trial evidence, would probably lead to a different result. *Id.*

¶ 36    However, this court has not previously addressed whether this standard differs based on whether the petitioner was convicted at trial or he pleaded guilty. In both *Edwards* and *Robinson*, the petitioners who sought leave to file successive petitions had been convicted at trial. *Edwards*, 2012 IL 111711, ¶ 7; *Robinson*, 2020 IL 123849, ¶ 17. This question arises because in *Reed*, we espoused a new, higher standard at the third stage for guilty-plea petitioners seeking relief based on actual innocence. *Reed*, 2020 IL 124940, ¶ 49.

¶ 37    In *Reed*, the central question was whether a guilty plea prevented a defendant from asserting an actual innocence claim under the Act. *Id.* ¶ 20. After explaining the benefits, burdens, and purpose served by the plea-bargaining system, we ultimately held that a defendant's guilty plea does not prevent him from asserting a claim of actual innocence under the Act. *Id.* ¶¶ 25-37, 41. Even so, we were sensitive to the State's concerns that allowing a petitioner to raise an actual innocence claim following a guilty plea would "diminish its motivation to engage in plea negotiations" and potentially "ignore the interests of finality and certainty involving guilty pleas." *Id.* ¶ 42. We found "the State's interests and policy concerns are more appropriately accounted for and protected by the standard applicable to actual

innocence claims involving defendants who plead guilty." *Id.* In determining the applicable standard, we noted that the *Washington* standard was impractical because, where a petitioner pleaded guilty, the State does not admit the entirety of its evidence against defendant into the record. "Without the developed record produced by a trial, a court cannot determine whether the new evidence sufficiently undermines the evidence presented at trial such that it would probably change the result on retrial." *Id.* ¶ 45. In light of all of these considerations, we determined that a higher standard was required in order to strike "an equitable balance between the defendant's constitutional liberty interest in remaining free of undeserved punishment and the State's interest in maintaining the finality and certainty of plea agreements, while vindicating the purpose of the criminal justice system to punish only the guilty." *Id.* ¶ 50. Therefore, we amended the *Washington* standard for guilty-plea petitioners and held that "a successful actual innocence claim requires a defendant who pleads guilty to provide new, material, noncumulative evidence that clearly and convincingly demonstrates that a trial would probably result in acquittal." *Id.* ¶ 49. We noted that this was a "comprehensive approach where the court must determine whether the new evidence places the evidence presented in the underlying proceedings in a different light and 'undercuts the court's confidence in the factual correctness' of the conviction." *Id.* (quoting *Coleman*, 2013 IL 113307, ¶ 97).

¶ 38     *Reed* was an appeal from a ruling following a third-stage evidentiary hearing. Thus, by amending the *Washington* standard, we necessarily raised the applicable burden of proof the petitioner needed to meet from preponderance of the evidence to the more stringent clear and convincing standard. However, *Reed* left open the question of what standard a guilty-plea petitioner raising a claim of actual innocence would need to satisfy at the leave-to-file stage. See *id.* ¶ 65 (Michael J. Burke, J., specially concurring) ("The majority opinion raises the burden from preponderance of the evidence to clear and convincing evidence at the third stage but says nothing about the burden a petitioner must meet at the first two stages."). We now hold that the same standard applies at the leave-to-file stage regardless of whether the petitioner pleaded guilty or was convicted at trial.

¶ 39     Initially, we note that the Act does not distinguish between petitioners who seek relief after a trial from those who seek relief following a guilty plea. This court made that distinction in *Reed* due to the interests at play when the parties enter into a mutually beneficial plea agreement (*id.* ¶¶ 45-48 (majority opinion)), particularly the concern that the petitioner's guilty plea prevented the State from admitting the entirety of its evidence against petitioner. *Id.* ¶ 45. Therefore, when the petitioner later claims actual innocence based on new evidence, the circuit court can only weigh that evidence against an underdeveloped record and petitioner's voluntary and knowing admission of guilt. *Id.* ¶ 46. This may leave the State at a disadvantage because it may have presented more evidence that would defeat petitioner's claim of innocence had the case gone to trial. These concerns remain valid but are more suitably addressed in an evidentiary hearing, where the petitioner's evidence can be tested and where we have already held a higher standard applies to a guilty-plea petitioner's claims. *Id.* ¶ 49.

¶ 40     At the leave-to-file stage, the circuit court is limited to determining whether the petitioner has satisfied the applicable test to enable him to file his successive petition. In assessing whether a petitioner has satisfied the low threshold applicable to a colorable claim of actual innocence, the court considers only whether the new evidence, if believed and not positively rebutted by the record, could lead to acquittal on retrial. *Robinson*, 2020 IL 123849, ¶ 60. The circuit court cannot make credibility determinations at this stage. To create a different standard

at the leave-to-file stage—under which the circuit court would necessarily make credibility or reliability determinations in order to conform with the clear and convincing standard—would create a confusing patchwork of rules. See *Reed*, 2020 IL 124940, ¶ 50 n.2 (acknowledging the clear and convincing standard inherently requires the court to consider the new evidence to be reliable but noting that such determination should be made at a third-stage evidentiary hearing, as all well-pleaded facts must be taken as true at the pleading stages).

¶ 41 The State's argument illustrates the difficulty in applying the clear and convincing standard at the leave-to-file stage. At that stage, the State argues, a guilty-plea petitioner raising an actual innocence claim must make a colorable showing that he can satisfy *Reed*'s clear and convincing standard. However, the State's argument relies on the premise that reliability refers to classes or types of evidence that can be significantly corroborated, such as forensic evidence, photographs, and credit card slips. The State argues that other categories, such as recantations and "11th hour affidavits," should be deemed unreliable at the leave-to-file stage. As we did when the State previously raised similar arguments in *Reed*, we find such categorization inappropriate and leave reliability determinations to later stages of the postconviction proceedings. *Id.* ¶ 50; see also *People v. Sanders*, 2016 IL 118123, ¶¶ 32-33 (rejecting the State's argument that a threshold finding of trustworthiness must be made before a court may determine whether a postconviction petitioner has set forth a colorable claim of actual innocence because that determination is not made at the second stage of postconviction proceedings where well-pleaded facts must be taken as true). Without adding reliability as a factor at the leave-to-file stage, the State's argument for a colorable, yet clear and convincing, standard would not work.

¶ 42 The dissent would accept the State's colorable clear and convincing standard. The dissent asserts that the proper standard after *Reed* and *Edwards* is that, to satisfy a colorable claim of actual innocence, the petitioner must present evidence that establishes "by clear and convincing evidence that no reasonable juror would have found him guilty." *Infra* ¶ 91. The dissent does not reconcile its requirement that petitioner adhere to the "clear and convincing" standard while also being allowed to proceed under the lower "colorable" standard applicable at the leave-to-file stage. Instead, the dissent summarizes the standard it would apply as follows.

> "In other words, a petitioner cannot meet the new heightened requirement unless the court finds at the leave-to-file stage that, as a matter of law, taking the well-pleaded new evidence as true, it is clear and convincing that no juror, acting reasonably, would have voted to find him guilty." *Infra* ¶ 91.

The dissent would therefore apply the third-stage standard established in *Reed* at the leave-to-file stage and do away with the colorable standard for guilty plea petitioners. If the petitioner could meet this standard at the leave-to-file stage, what would be the purpose of the other two stages?

¶ 43 Additionally, to make its standard work, the dissent engages in the credibility and reliability determinations we have stated do not apply at the leave-to-file stage. See *Reed*, 2020 IL 124940, ¶ 50 n.2. For example, the dissent compares the evidence presented in the factual basis to the Moore affidavit and concludes the affidavit is insufficient because Moore did not observe the actual shooting, did not identify one of the victims as having been around prior to the shooting, and does not directly contradict the testimony of multiple eyewitnesses. *Infra* ¶ 102. The dissent essentially decides the affidavit from Moore is insufficient because it is

inconsistent with the testimony from the witnesses in the record and Moore is not as credible as they are. These should be third-stage considerations.

¶ 44   We note that applying the same standard at the leave-to-file stage for guilty-plea petitioners as for petitioners that proceed to trial would not result in every guilty plea petition advancing to the third stage. The same procedures and considerations that are currently in place to keep legally or factually insufficient successive petitions from advancing to the next stage will remain in place and work to keep meritless petitions from advancing to the next stage.

¶ 45   Accordingly, we hold that for all petitioners seeking relief on a claim of actual innocence, leave of court should be granted where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence. *Robinson*, 2020 IL 123849, ¶ 44; *Edwards*, 2012 IL 111711, ¶ 24. To establish that colorable claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably result in acquittal.[2] See *Robinson*, 2020 IL 123849, ¶ 47; *Edwards*, 2012 IL 111711, ¶ 32.

¶ 46   The dissent recognizes that these are the requirements we established in *Edwards*. *Infra* ¶ 80. However, the dissent also asserts that

> "the majority tentatively posits that leave to file should be granted if the evidence is 'of such conclusive character that it would probably result in acquittal.' *Supra* ¶ 45. At another point, the majority posits that leave to file should be granted if 'the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence.' *Supra* ¶ 45." *Infra* ¶ 87.

The dissent posits that this creates "two different and irreconcilable leave-to-file standards." *Infra* ¶ 87. We disagree. The standards the dissent takes issue with are directly from this court's decisions in *Edwards* and *Robinson*. *Robinson*, 2020 IL 123849, ¶¶ 44, 47; *Edwards*, 2012 IL 111711, ¶¶ 24, 32. We do nothing more than adhere to these rules in the context of the leave-to-file stage for a successive petition filed by a guilty plea petitioner. We break no new ground by relying on the standards this court has previously set forth for a claim of actual innocence based on newly discovered evidence.

¶ 47   Having determined the applicable standard, we now look at the evidence petitioner presented to determine whether he made a colorable showing of actual innocence.

---

[2]We note that, on the third element of an actual innocence claim, *Edwards* and *Robinson* use the phrase "of such conclusive character that it would probably *change the result on retrial*." (Emphasis added.) *Robinson*, 2020 IL 123849, ¶ 47; *Edwards*, 2012 IL 111711, ¶ 32. We use the phrase "of such conclusive character that it would probably result in acquittal" because here the petitioner pleaded guilty, and this is the phrase used in *Reed* with reference to the standard the guilty plea petitioner has to meet at the third-stage proceeding. *Reed*, 2020 IL 124940, ¶ 49 ("We therefore find a successful actual innocence claim requires a defendant who pleads guilty to provide new, material, noncumulative evidence that clearly and convincingly demonstrates that a trial would probably result in acquittal.").

## C. Petitioner's Claim of Actual Innocence and Supporting Documentation

### 1. *Petitioner's Newly Discovered Evidence Supports Different Claims*

First, we must review the evidence upon which petitioner relied when he sought leave to file his successive postconviction petition so we can determine whether the evidence he presented supported both claims in the petition. This is an important step in our analysis because a conflict has evolved regarding whether evidence submitted to support a claim that a petitioner's constitutional rights were violated can simultaneously support an actual innocence claim. This conflict appears to stem from our decisions in *Washington*, 171 Ill. 2d 475, and *People v. Hobley*, 182 Ill. 2d 404 (1998). See 2022 IL App (1st) 191101-B, ¶¶ 29-33. However, we agree with the appellate court that in this case, the evidence petitioner provided—while interrelated—was not relied on to simultaneously support both claims. *Id.* ¶ 35. Therefore, we leave for another day the question of whether a petitioner may raise his claim of actual innocence based on the same evidence petitioner uses to support his claims of constitutional violations.[3]

In his petition, petitioner's first argument was that counsel was ineffective for failing to investigate Butler after petitioner informed counsel that he heard rumors around the jail that Butler was the person who killed Williams. As part of that argument, petitioner noted he informed counsel that his confession was false and a result of duress, psychological abuse, and mental coercion from being detained for 30 hours by Detectives Folino and McDermott with no sleep. Petitioner attached evidence he identified as "newly discovered evidence of police misconduct of Det. John Folino and Tim McDermott." In his brief before this court, petitioner notes that his "allegation that his confession was coerced by the investigating detectives, as supported by the lawsuit documentation he attached to his petition, supports his claims that defense counsel failed to investigate his case before inducing him to plead guilty."

Petitioner's second claim in his petition was that he had newly discovered evidence showing that he was actually innocent. Petitioner summarized and referenced the affidavits of Moore and Myles. Read in context, the evidence of the lawsuits filed against McDermott and Folino supports petitioner's first claim, and the affidavits petitioner provided support his actual innocence claim. We review these affidavits to determine whether they raise the probability that it is more likely than not that no reasonable juror would have convicted petitioner in light of the new evidence. See *Edwards*, 2012 IL 111711, ¶ 33.

### 2. *Petitioner's Affidavits Support His Colorable Claim of Actual Innocence*

Before the appellate court, the State conceded, and the court agreed, that the affidavits petitioner presented constituted new, material, and noncumulative evidence. 2022 IL App (1st) 191101-B, ¶ 60. The State makes the same concession before this court, that the affidavits are new and noncumulative, but only concedes Moore's eyewitness affidavit is material. The State notes that Myles's affidavit is not material but adds that it does not argue this point, choosing

---

[3]We note that we recently allowed a petition for leave to appeal in *People v. Flournoy*, 2022 IL App (1st) 210587-U, ¶ 29, *appeal allowed*, No. 129353 (Ill. Mar. 29, 2023), which raises this issue.

to argue instead that Myles's affidavit does not provide clear and convincing evidence of innocence. We accept the State's concessions and note that, to the extent the State is making an argument that Myles's affidavit is not material, the State does so in a footnote in its reply brief. As such, the State forfeits the argument. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 55 The appellate court accepted the State's concession because petitioner could not have discovered the information in either Moore's or Myles's affidavits earlier through due diligence, as he did not meet either individual until after he was sentenced and entered prison. 2022 IL App (1st) 191101-B, ¶ 60. The court also found the evidence "clearly material" because it addressed the identity of the shooter, suggested the State's witnesses falsely identified petitioner as the shooter, and included a motive for the witnesses in falsely identifying petitioner as the shooter. *Id.* The evidence was not cumulative because the State's factual basis did not present any witness who identified an alternate shooter. *Id.* We agree with the appellate court's assessment. The only remaining question is whether the affidavits of Moore and Myles raise the probability that it is more likely than not that no reasonable juror would have convicted petitioner. In conducting this review, we must take the statements in the affidavits as true. *Robinson*, 2020 IL 123849, ¶ 45 ("At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true.").

¶ 56 In his affidavit, Moore averred that he was near the scene of the shooting and saw a man he recognized as Butler exit an alley. Butler pulled out a gun and jogged across the street toward the area where the shooting occurred. A few seconds later, Moore heard five loud gunshots and then saw Butler run back past Moore's car and into the alley from which he had emerged. We agree with the appellate court that Moore's alleged eyewitness account identified Butler as the actual shooter. 2022 IL App (1st) 191101-B, ¶ 62. While Moore does not aver he actually saw Butler shoot the victims, this is the reasonable inference that flows from the facts he provides in his affidavit. He thus provides sufficient information to raise the probability that it is more likely than not that no reasonable juror would have convicted petitioner in light of Moore's proposed testimony.

¶ 57 The State argues that Moore's affidavit should be rejected because it is an uncorroborated, "eleventh-hour affidavit" from an incarcerated inmate and, as such, it is not reliable enough to demonstrate petitioner's innocence clearly and convincingly. The State and the dissent note that Moore's affidavit is contradicted by the witness testimony provided in the State's factual basis for petitioner's guilty plea. These concerns are valid; however, as we have explained above, these arguments would be addressed at the evidentiary hearing. At that hearing, the court would hear directly from Moore and make a finding as to his credibility. Importantly, the State would also have the opportunity to test Moore's eyewitness account in the crucible of cross-examination.

¶ 58 We find Myles's affidavit similarly supports a decision to advance petitioner's actual innocence claim to the second stage. Myles's affidavit, taken as true, provides evidence that could undermine Harmon's and Barnes's identifications of petitioner as the shooter. Myles averred he had a conversation with McWilliams, who told Myles that petitioner was a scapegoat "so that [Lavertice Harmon's] and Kevin [Barnes's] drug business [could] continue

- 12 -

without further pressure from Chicago police." Myles stated that McWilliams told him that neither he nor Harmon nor Barnes saw the shooter's face, but they all falsely identified petitioner as the shooter. A year after the shooting, McWilliams discovered Houston owed Butler money from drug sales, and he believed that Butler was the actual shooter because of that debt.

¶ 59 The State argues that Myles's affidavit is unreliable because it is double hearsay, which should not be admissible at an evidentiary hearing. The State correctly acknowledges that hearsay evidence is allowed in postconviction proceedings. Ill. R. Evid. 1101(b)(3) (eff. Sept. 17, 2019) (providing that the rules of evidence do not apply to postconviction hearings). The plain language of the rule does not prohibit double hearsay or require corroboration of hearsay evidence. The State's argument is also premature. At the leave-to-file stage, the circuit court has to accept Myles's affidavit as true and reserve any determinations of credibility for the evidentiary hearing. The State can also argue that McWilliams's evidence should be corroborated for petitioner to meet the *Reed* standard at the third stage. At the leave-to-file stage, Myles's affidavit sufficiently undermines the factual basis as to present a colorable claim of petitioner's actual innocence. Additionally, neither affidavit is affirmatively rebutted by the record. *Robinson*, 2020 IL 123849, ¶¶ 45, 60 (well-pleaded allegations in the petition and supporting documents are not affirmatively rebutted by the record unless it is demonstrated by the record that a trier of fact could never accept their veracity).

¶ 60 We acknowledge that the evidence in the Moore and Myles affidavits conflict with the testimony of other witnesses that the State presented through the factual basis for petitioner's plea. However, as we stated in *Robinson*,

> "This court has never held that a request for leave to file a successive petition must be denied if the new evidence conflicts with the trial evidence. And, indeed, such a requirement would be fundamentally illogical. If the new evidence of innocence does not contradict the evidence of petitioner's guilt at trial, the filing of the successive petition would be pointless, and the purpose of the Act would be rendered meaningless, which is a result that must be studiously avoided." *Id.* ¶ 57.

¶ 61 The dissent would find the Moore and Myles affidavits cannot be taken as true because they are not "well-pleaded" because they contain "mere conclusions unsupported by specific facts." *Infra* ¶ 100. Specifically as to Moore's affidavit, the dissent finds that it "contains no specific facts to suggest that he was positioned such that he could observe the shooting," does not identify Houston and petitioner as having been at the scene, and does not contradict the testimony of multiple other eyewitnesses. *Infra* ¶ 102. Conclusory statements are statements that express "a factual inference without stating the underlying facts on which the inference is based." Black's Law Dictionary (11th ed. 2019). Here, Moore avers in his affidavit, "I informed Shamar that I witnessed that shooting and that I knew who the shooter was Jerrell Butler." However, the statement is preceded by Moore's specific statements regarding where he was on June 26, 2009, at 3 a.m. when he observed Jerrell Butler exit an alley carrying a gun and head in the direction of the park where the shooting took place. Seconds later, Moore heard five loud gunshots and saw Butler running back to the alley. Given the specific facts provided in Moore's affidavit, we find it is well pleaded and should be taken as true. Moore's affidavit, taken as true, presents evidence of an alternate shooter. Although multiple witnesses identified petitioner as the shooter, at the leave-to-file stage, the court may not engage in an assessment

- 13 -

of the relative weight of the evidence supporting petitioner's plea as compared to petitioner's new evidence of actual innocence. The fact that the affidavit conflicts with, but is not positively rebutted by, the State's witnesses on the identification of the shooter is insufficient to reject it. See *Robinson*, 2020 IL 123849, ¶ 73. Instead, it is a reason to allow petitioner to proceed, with counsel, on his colorable claim of actual innocence. *Id.*

¶ 62        The dissent also finds Myles's affidavit is not well pleaded because it "is rife with conclusory statements and is not based on specific facts but rather rumor, innuendo, and rank speculation." *Infra* ¶ 103. The Myles affidavit described a conversation with McWilliams, where McWilliams provided information that could impeach the State's eyewitnesses. McWilliams also told Myles that he saw the shooter and described him as a light-skinned man with braids. This description of the shooter did not match petitioner. Myles's affidavit, taken as true, presents an additional eyewitness who can testify that petitioner was not the shooter and can undermine the State's eyewitness. Myles presented specific facts to explain the approximate timing and location of his conversation with McWilliams and the specifics of that conversation. Myles's affidavit is therefore well pleaded. The shortcomings the dissent identifies regarding the information McWilliams provided should be addressed at a later stage where McWilliams can be questioned and his credibility assessed.

¶ 63        We agree with the appellate court that petitioner set forth a colorable claim of actual innocence based on Moore's and Myles's affidavits and the circuit court should have granted leave to file his successive postconviction petition. We affirm the appellate court's decision remanding the case for further postconviction proceedings under the Act.

¶ 64                    D. Petitioner's Ineffective Assistance of Counsel Claim

¶ 65        Having resolved petitioner's actual innocence claim, we turn to his claim that he received ineffective assistance of counsel because his attorney failed to move for the suppression of his allegedly coerced confession and instead convinced petitioner to plead guilty. The circuit court failed to address this claim. The appellate court did not address petitioner's ineffective assistance of counsel claim because it remanded petitioner's case based on his actual innocence claim. The State argues the appellate court erred in remanding the petition in its entirety without separately reviewing the ineffective assistance of counsel claim. We agree with the State.

¶ 66        Leave of court to file a successive postconviction petition may be granted only if a petitioner demonstrates (1) actual innocence or (2) "cause for his or her failure to bring *the claim* in his or her initial post-conviction proceedings and prejudice results from that failure." (Emphasis added.) 725 ILCS 5/122-1(f) (West 2018). The legislature codified the cause-and-prejudice test in the Act by adding section 122-1(f) following this court's holding in *Pitsonbarger*. *People v. Ortiz*, 235 Ill. 2d 319, 330 (2009). In *Pitsonbarger*, this court was asked to determine how the cause-and-prejudice test was to be used in granting leave to file successive postconviction petitions. The court held that "the cause-and-prejudice test is the analytical tool that is to be used to determine whether fundamental fairness requires that an exception be made to section 122-3 so that a claim raised in a successive petition may be considered on its merits." *Pitsonbarger*, 205 Ill. 2d at 459. When applying the test, this court was clear that "the fundamental fairness exception applies to claims, not to petitions, and the

cause-and-prejudice test must be applied to individual claims, not to the petition as a whole." *Id.* at 462.

¶ 67     Earlier in *Washington*, 171 Ill. 2d at 489, in recognizing that there was "footing in the Illinois Constitution for asserting freestanding innocence claims based upon newly discovered evidence under the Post-Conviction Hearing Act," we stated that "such claims should be resolved as any other brought under the Act." Therefore, in *Coleman*, 2013 IL 113307, ¶ 91, we held that, "[w]here a defendant makes a claim of trial error, as well as a claim of actual innocence, in a successive postconviction petition, the former claim must meet the cause-and-prejudice standard, and the latter claim must meet the *Washington* standard." We thus reiterate that, in line with this court's precedent, even if petitioner had a colorable actual innocence claim, petitioner was required to prove he satisfied the cause-and-prejudice test as to his ineffective assistance of counsel claim before he could be granted leave to file his successive postconviction petition. Any claim in a successive petition should not be advanced without a determination that the claim has met the appropriate standard. *Id.*

¶ 68     The appellate court relied on this court's decision in *Cathey*, 2012 IL 111746, ¶ 34, finding that partial summary dismissals are not permitted under the Act, to conclude that petitioner's ineffective assistance of counsel claim could be remanded for further proceedings without a showing of cause and prejudice. 2022 IL App (1st) 191101-B, ¶ 68. *Cathey* is distinguishable because the postconviction petition at issue in that case was an initial petition, which does not face the same restrictions as a successive petition. 725 ILCS 5/122-1(f) (West 2018). When an initial postconviction petition is advanced to the second stage, the court advances the entire petition because partial summary dismissals are not permitted under the Act. *Cathey*, 2012 IL 111746, ¶ 34. However, as explained above, this is not the case with motions for leave to file successive postconviction petitions.

¶ 69     Petitioner argues that this rule would be premature and would render meaningless the procedures under the Act and this court's Rule 651(c). Ill. S. Ct. R. 651(c) (eff. July 1, 2017). This is because, even with a successive petition, a petitioner is allowed to amend a petition at the second stage once he is represented by counsel. The State then has an opportunity to seek dismissal of the petition on any grounds, including petitioner's failure to prove cause and prejudice for not having raised the claims in an initial petition. *People v. Bailey*, 2017 IL 121450, ¶ 26. Petitioner's argument is unconvincing because even at the second stage, if a petitioner sought to amend his successive petition to include a new claim, he would still have to satisfy the cause-and-prejudice test as to that claim. Requiring this showing at the leave-to-file stage does nothing to diminish or render meaningless counsel's duty to amend a petition as necessary.

¶ 70     Finally, relying on some language from *Pitsonbarger*, petitioner notes that "this Court did not foreclose an argument that prior proceedings on a petition might be so fundamentally flawed that an individual assessment of each claim for cause and prejudice was unnecessary." See *Pitsonbarger*, 205 Ill. 2d at 463 ("We need not decide whether an initial proceeding could be so pervasively flawed that cause and prejudice are evident without individual claim-by-claim consideration, because this is not such a case."). Petitioner fails to follow up this citation with any argument that his initial postconviction proceedings were so flawed that he should not have to show cause and prejudice as to each claim in his successive petition. We decline to address this aspect of petitioner's argument because he failed to argue the point in his brief,

which results in forfeiture of the issue. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Consistent with the plain language of the rule, this court has repeatedly held that the failure to argue a point results in forfeiture of the issue. *Vancura v. Katris*, 238 Ill. 2d 352, 369 (2010) (citing relevant cases).

¶ 71 Petitioner alternatively asks that we remand the case to the appellate court for its determination on whether he satisfied the cause-and-prejudice test for his ineffective assistance of counsel claim. Because neither the circuit court nor the appellate court evaluated this claim to determine whether petitioner could meet the cause-and-prejudice test, we grant petitioner's request and remand the case to the appellate court to determine whether petitioner should be granted leave to file his successive postconviction petition based on his ineffective assistance of counsel claim. *People v. Prante*, 2023 IL 127241, ¶ 88 (" 'where trial errors were raised but not ruled upon in the appellate court, it is appropriate for this court to remand the cause to the appellate court for resolution of those remaining issues' " (quoting *People v. Lowery*, 178 Ill. 2d 462, 473 (1997))).

¶ 72                                    III. CONCLUSION

¶ 73 For the foregoing reasons, we affirm in part the judgment of the appellate court, which reversed the circuit court's dismissal of petitioner's motion for leave to file a successive postconviction petition. We reverse the appellate court's decision remanding petitioner's ineffective assistance of counsel claim to the circuit court for further proceedings. We remand the case to the appellate court for a determination of whether petitioner satisfied the cause-and-prejudice test as to his ineffective assistance of counsel claim. Should the appellate court find petitioner satisfied the test, the entirety of petitioner's successive postconviction petition shall be remanded to the circuit court for further proceedings under the Act. Should the appellate court find petitioner failed to satisfy the cause-and-prejudice test, petitioner's successive petition shall be remanded for further proceedings as to his claim of actual innocence.

¶ 74 Appellate court judgment affirmed in part and reversed in part.

¶ 75 Cause remanded with directions.

¶ 76 CHIEF JUSTICE THEIS, dissenting:

¶ 77 Today the majority holds that, in determining whether to grant leave to file a successive postconviction petition based on an actual innocence claim, the same standard applies regardless of whether a petitioner was convicted following a trial or following a plea of guilty. *Supra* ¶ 38. The majority has taken the latter type of claim, which requires clear and convincing evidence and which is supposed to be extraordinarily difficult to meet in a successive postconviction proceeding that is highly disfavored, and settles instead on a threshold that meets none of these requirements. Rather, as we have previously held, a plea necessarily places the court in a different position than following a trial. Because the majority upends our precedent and undermines the value of a guilty plea, I respectfully dissent.

¶ 78 In a line of decisions beginning with *People v. Washington*, 171 Ill. 2d 475 (1996), this court has laid out the contours of establishing a postconviction actual innocence claim and the standards that apply based on various factors. In *Washington*, we first recognized that a claim

- 16 -

of actual innocence was cognizable under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 1992)) as a matter of due process. *Washington*, 171 Ill. 2d at 487-88. We highlighted that, under the rubric of due process, the evidence of actual innocence must be "compelling" (*id.* at 489), indicating that the due process clause would provide a meaningful avenue to remedy a manifest injustice while ensuring that a petitioner's case is truly extraordinary. Thus, to assert an actual innocence claim based on newly discovered evidence, we held that, procedurally, such a claim should be resolved like any other claim brought under the Act but that, substantively, the supporting evidence must be "new, material, noncumulative and, most importantly, of such conclusive character as would probably change the result on retrial." (Internal quotation marks omitted.) *Id.*

¶ 79      We have also explained that a petitioner seeking to file a successive postconviction petition is subject to a more heightened pleading requirement. *People v. Smith*, 2014 IL 115946, ¶ 35; *People v. Robinson*, 2020 IL 123849, ¶ 43. This more demanding standard finds its support in the Act, which contemplates the filing of only one petition without leave of court, and the well-settled rule that successive postconviction petitions are highly disfavored by Illinois courts. *People v. Bailey*, 2017 IL 121450, ¶ 39; *People v. Edwards*, 2012 IL 111711, ¶¶ 26-29. Successive petitions are disfavored because they "plague the finality of criminal litigation." *People v. Tenner*, 206 Ill. 2d 381, 392 (2002).

¶ 80      In *Edwards*, we specifically addressed this more demanding pleading standard at the leave-to-file stage for a successive petition claiming actual innocence. We held that in addition to the requirements that the evidence be newly discovered, material, and noncumulative, at the leave-to-file stage, "a petitioner's request for leave of court and his supporting documentation must set forth a colorable claim of actual innocence, *i.e.*, they must raise the probability that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Edwards*, 2012 IL 111711, ¶ 33. Thus, the "no reasonable juror" standard in *Edwards* expressly established a higher threshold at the leave-to-file stage for successive petitions than the lower threshold set forth in a first-stage proceeding under *Washington*.

¶ 81      We also highlighted that the "no reasonable juror" standard requires a stronger showing than that required to establish *Strickland* prejudice. *Id.* ¶ 40; see *Strickland v. Washington*, 466 U.S. 668 (1984). In other words, a petitioner must show more than a reasonable probability that the factfinder would have had a reasonable doubt with respect to guilt. *Strickland*, 466 U.S. at 695. Rather, under the *Edwards* standard a petitioner must show that it is more likely than not that *no single juror*, acting reasonably, would agree to convict him. We have since continued to restate that a "freestanding actual innocence claim raised in a successive postconviction petition is an extraordinary remedy." *People v. Taliani*, 2021 IL 125891, ¶ 67.

¶ 82      In *Robinson*, the procedural posture was the same. We reiterated the heightened *Edwards* standard for successive petitions at the leave-to-file stage. *Robinson*, 2020 IL 123849, ¶ 44 (citing *People v. Sanders*, 2016 IL 118123, ¶ 24, and *Edwards*, 2012 IL 111711, ¶ 24). In addition to the other pleading requirements that the evidence be new, material, and noncumulative, *Robinson* reaffirmed that leave of court should be granted only "where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Id.* (citing *Sanders*, 2016 IL 118123, ¶ 24); see also *id.* ¶ 50; *id.* ¶ 61 (citing *Edwards*, 2012 IL 111711, ¶ 24).

¶ 83        We found the lower courts erred in employing this standard under the circumstances of that case. For example, we rejected the lower court's erroneous standard that required evidence of total vindication or exoneration to support a claim of actual innocence. *Id.* ¶ 55. We rejected the lower court's finding that a successive petition must be denied at the leave-to-file stage "if the new evidence conflicts with the trial evidence." *Id.* ¶ 57. We corrected the appellate court's erroneous belief that evidence would be positively rebutted by the record "simply because it was contradicted by the evidence presented at trial." *Id.* ¶ 60. We reaffirmed that, given the procedural posture of the case, reliability arguments and credibility determinations were premature. *Id.* ¶ 81.

¶ 84        *Robinson* was merely an application of the *Edwards* standard to the circumstances of that case, which we reiterated multiple times, to determine whether the petitioner's motion for leave to file the successive petition, along with the supporting affidavits, raised the probability that it is more likely than not that no reasonable juror would have convicted him, considering the new evidence. *Id.* ¶¶ 16, 50, 61. Tellingly, we never overruled the *Edwards* standard nor departed from *stare decisis* principles, which provide stability, predictability, and legitimacy to this court's decisions.

¶ 85        Thereafter, in *People v. Reed*, 2020 IL 124940, we were asked to consider whether a guilty plea precluded a subsequent claim of actual innocence. While recognizing such a claim was not precluded, we considered the effect of a petitioner's guilty plea on an actual innocence claim. After thoroughly addressing the significant consequences that a plea entails for both parties (*id.* ¶ 28), we expressly articulated that such a claim "necessarily places the court in a different position" than an actual innocence claim made after a trial (*id.* ¶ 45). We specifically recognized that, when a defendant waives trial, the defendant "prevent[s] the State from admitting the entirety of its evidence against [the] defendant into the record, leaving only [the] defendant's admission of guilt and stipulation of the factual basis of the plea." *Id.* As such, we found that the State's interests and policy concerns would be "accounted for and protected by the standard applicable to actual innocence claims involving defendants who plead guilty." *Id.* ¶ 42. Thus, we expressly articulated that the standard for filing an actual innocence claim following a guilty plea must be higher than that for defendants convicted after a trial.

¶ 86        We held that "a successful actual innocence claim requires a defendant who pleads guilty to provide new, material, noncumulative evidence that clearly and convincingly demonstrates that a trial would probably result in acquittal." *Id.* ¶ 49. Because the case involved a third-stage dismissal, we recognized that the trial court acted as a factfinder, making credibility determinations and weighing evidence. *Id.* ¶ 51. As such, instead of *de novo* review, we reviewed the trial court's decision to deny relief for manifest error. *Id.*

¶ 87        Thus, to summarize, our precedent raised the standard of proof for a successful claim following a guilty plea to clear and convincing evidence and determined that the calculus is clearly different when a petitioner pleads guilty and files a successive postconviction petition claiming actual innocence. The majority, however, ignores that clear precedent. Instead of articulating a colorable claim that aligns with that heightened standard, it resigns itself to an ill-described lower threshold for a colorable claim. At one point, the majority tentatively posits that leave to file should be granted if the evidence is "of such conclusive character that it would probably result in acquittal" *Supra* ¶ 45. At another point, the majority posits that leave to file should be granted if "the petitioner's supporting documentation raises the probability that it is

more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Supra* ¶ 45. The majority compounds the confusion that it creates by articulating two different and irreconcilable leave-to-file standards, with the unconvincing explanation that the higher threshold demanded by *Reed* and *Edwards* would "create a confusing patchwork of rules." *Supra* ¶ 40. Instead, the majority creates confusion in the name of dispelling it and, in doing so, undermines the value of a knowing, voluntary, and intelligent plea of guilty and deals a serious blow to the well-settled consequences that this court has long attached to the decision to plead guilty.

¶ 88    A petitioner seeking leave to file a successive petition raising an actual innocence claim must meet a standard that properly accounts for the differences, balances the due process interests of a defendant, and recognizes the finality of a plea. That calculus was already made by this court in *Reed*. The problem with the majority's standard is that it fails to recognize that, while the petitioner's burden regarding the new evidence is more stringent at each stage of the proceedings (from colorable, to substantial, to credible and reliable), the reasons for adopting that heightened "clear and convincing" standard in *Reed* apply with equal force at every stage of the postconviction proceedings.

¶ 89    Additionally troubling and problematic in application is the majority's failure to sufficiently account for the problem that arises every time a defendant is allowed to assert an actual innocence claim years after a guilty plea, where there is no prior trial record. "[B]y entering into a plea agreement, the State loses its opportunity to present its full case and instead provides only a summary of the evidence sufficient to establish a factual basis for the pleas." *Reed*, 2020 IL 124940, ¶ 61 (Michael J. Burke, J., specially concurring). Unlike after a trial, where the record is preserved, the State is hampered in its ability to present the evidence because it may no longer be available to the State, as witnesses may no longer be living or reachable and they likely cannot recall the facts and circumstances years later. The trial judge is left having to compare the new evidence with only a summary of the evidence presented to establish the factual basis for the plea.

¶ 90    Thus, given this very real predicament, there must be real consequences attached to the decision to plead guilty that consistently apply at every stage of the postconviction proceedings. Stated differently, the leave-to-file standard for successive postconviction actual innocence claims following a guilty plea must account for both *Reed* and *Edwards*. At the leave-to-file stage, a petitioner asserting such a claim must make a colorable showing that the petitioner could meet the heightened *Reed* standard. A petitioner also must meet the heightened pleading standard espoused in *Edwards* for successive petitions claiming actual innocence at the leave-to-file stage.

¶ 91    Following *Reed* and *Edwards*, to satisfy a colorable claim of actual innocence, our precedent requires that a petitioner must present sufficient evidence such that, based on the well-pleaded facts, the petitioner can establish by clear and convincing evidence that no reasonable juror would have found him guilty. In other words, a petitioner cannot meet the new heightened requirement unless the court finds at the leave-to-file stage that, as a matter of law, taking the well-pleaded new evidence as true, it is clear and convincing that no juror, acting reasonably, would have voted to find him guilty. That means the court must assess at the leave-to-file stage how reasonable jurors would have reacted to the new well-pleaded

evidence, taking that evidence as true and comparing that evidence with the evidence presented by the State as the factual basis for the guilty plea, along with petitioner's admission of guilt.

¶ 92    Applying that proper heightened pleading standard here, petitioner failed as a matter of law to meet the requirements for leave to file his actual innocence claim. Given the factual basis for the plea, including multiple eyewitnesses to the murder that identified defendant as the shooter and another witness that testified that defendant confessed to the murder to him, as well as petitioner's admission of guilt at the plea hearing, a reasonable factfinder could still vote to convict petitioner even with the introduction of the affidavits of Moore and Myles.

¶ 93    In this case, the factual basis for the plea included the detailed, under oath, grand jury testimony of Harmon. Harmon, an eyewitness, stated that he was in the vicinity of the shooting with Battle, Washington, Barnes, and others around 3 a.m. on June 26, 2009. Harmon saw a dark-colored, four-door vehicle without its headlights on, driving south on LeClaire Avenue from Le Moyne Street. When the car pulled up, Harmon recognized petitioner, whom he had known for 10 years. Petitioner called him over to the car, where Harmon saw a chrome-colored handgun with a black handle in petitioner's lap, wrapped in a bandana. Petitioner told him he was going to kill Williams because she had previously stabbed petitioner. Petitioner agreed to allow Harmon to warn his friends and told Harmon he would drive around the block.

¶ 94    Harmon warned Williams and Houston to leave the area. Williams was reluctant but agreed, and they all walked toward a park. As they were walking, Harmon spotted petitioner, who had a brief conversation with Williams. He saw petitioner, armed with a handgun, take out his gun and shoot Williams. Houston fled. Petitioner chased him and fired multiple shots at him. Petitioner went back to Williams and fired an additional shot at her. She fell to the ground. Petitioner then ran back to his car and drove away. The autopsy report confirmed Williams died from multiple gunshot wounds.

¶ 95    The grand jury testimony was corroborated by the eyewitness testimony of Houston, who was shot multiple times at the scene, in addition to the grand jury testimony of Battle and Barnes. Houston would have testified consistently with Harmon that he saw petitioner shoot Williams and that petitioner shot Williams twice with a handgun and then chased him down and shot him four times. He identified petitioner in a lineup as the shooter and would identify petitioner in court. Battle and Barnes testified to the grand jury that they knew petitioner and identified him as the shooter of Williams and Houston.

¶ 96    The State also presented the grand jury testimony of Winters, who stated that he had a phone conversation with petitioner. Winters testified that petitioner confessed to him that he was the shooter.

¶ 97    Petitioner's actual innocence claim is predicated on the theory that another individual murdered Williams and that the eyewitnesses had a motive to lie to the police and all decided to frame petitioner for the murder. In support, he presented two affidavits.

¶ 98    Moore's affidavit recounts that he was parked in his car across from Lafayette Park in Chicago at around 3 a.m. on June 26, 2009. There was a group of 6 to 10 black men and 1 woman standing around. Moore then saw a man he recognized as Jerrell Butler exit an alley. Butler greeted Moore, pulled out a gun from his waistband, and jogged across the street toward the park. A few seconds later, from his car, Moore heard five gunshots. He then saw Butler run past his car and into the same alley from which he had emerged. Moore never mentioned what

he saw because he was afraid of Butler and his friends. When he was incarcerated with petitioner in 2018, Moore told petitioner that he had witnessed the shooting.

¶ 99    Myles's affidavit recounts a conversation with his friend, McWilliams, in 2015 about a shooting that "happened on June 25, 2009." Aside from the fact that the shooting at issue in this case happened on June 26, 2009, Myles states that he was incarcerated at the time of the shooting but that his friends McWilliams, Barnes, and Harmon witnessed the shooting. McWilliams told Myles in 2015 that they lied in 2009 and told police that petitioner was the shooter so that Barnes's and Harmon's drug business could continue without pressure from the police. Myles's affidavit does not explain why he never reached out to petitioner about this information for the three years between 2015 and 2018. Nor does he explain why McWilliams never reached out to petitioner with this information.

¶ 100    In comparing the factual basis for the plea with the new evidence at the leave-to-file stage, the trial judge must test the legal sufficiency of the petition and supporting documentation. "At the pleading stage of postconviction proceedings, all *well-pleaded* allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." (Emphasis added.) *Robinson*, 2020 IL 123849, ¶ 45 (citing *Edwards*, 2012 IL 111711, ¶¶ 42, 48, *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002), and *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1988)). That means that, prior to third-stage proceedings, only well-pleaded allegations and supporting evidence will be taken as true. See *id*. "Well pleaded" means that, when examining the sufficiency of the petition, mere conclusions unsupported by specific facts are insufficient to meet Illinois's fact-pleading standards. Today, the majority eviscerates this fundamental principle of pleading, finding that this principle regarding "well-pleaded" facts somehow now only applies at the second stage of proceedings. *Supra* ¶ 43. This distinction is erroneous because both the leave-to-file stage and the second stage are stages in which only *well-pleaded* factual allegations are taken as true. See *Robinson,* 2020 IL 123849, ¶ 45; *Sanders*, 2016 IL 118123, ¶¶ 31, 33; see also *People v. Wideman*, 2016 IL App (1st) 123092, ¶¶ 59-62 (supporting documentation that does not contain well-pleaded facts is insufficient to support granting leave to file a successive postconviction petition).

¶ 101    Additionally, our precedent makes clear that, at the leave-to-file stage, the trial court must act as a gatekeeper exercising its judgment "considering the prior evidence along with the new evidence." *Robinson*, 2020 IL 123849, ¶ 48. After today, under the majority's analysis, the trial court no longer has this gatekeeping function but instead has no choice but to grant leave to file in every case regardless of whether the new evidence was based on mere conclusions unsupported by specific facts.

¶ 102    Even under the *Robinson* standard, it cannot be said that it is more likely than not that no reasonable juror would convict defendant in light of the new evidence. Moore's affidavit contains no specific facts to suggest that he was positioned such that he could observe the shooting. His affidavit makes it clear that he did not observe the shooting. Even though he knows Houston and it is undisputed that Houston was shot at the scene of the murder, Moore did not identify Houston as one of the people standing around prior to the shooting. Moore was across from the park in his car and simply stated that he "heard five gun shots," from his position sitting in his car, but did not see the shooter. Nor does his affidavit state any specific facts to contradict the testimony from multiple eyewitnesses that saw petitioner shoot the woman in the group, chase Houston, shoot Houston, and then go back and shoot the woman

again and observe her fall to the ground. Moore also stated that he knew petitioner from his neighborhood but never stated in his affidavit that he did not see petitioner at the scene of the murder. Moore's affidavit, even taken as true, is anything but well-pleaded evidence to support petitioner's innocence when compared to the factual basis of the plea.

¶ 103    Myles's affidavit is rife with conclusory statements and is not based on specific facts but rather rumor, innuendo, and rank speculation. Many of the statements are not material to petitioner's innocence. The affidavit fails to meet even the most liberal pleading standards and is replete with deficiencies. For example, McWilliams told Myles that he, Barnes, and Harmon "didn't recognize the shooter['s] face." This statement regarding Barnes and Harmon is merely an unsupported conclusory opinion about what someone else saw or did not see. McWilliams's statement that the reason he identified petitioner to police is that "it was known" that petitioner had a prior conflict with Houston is also a purely unsupported rumor. McWilliams does not provide any specific facts as to how he knows this information or any specific person who told him this information. Nor does he explain the conflict.

¶ 104    Rather, the statement that petitioner had a prior conflict with Houston instead connects petitioner to the shooting and supports a motive for defendant to shoot Houston; it adds nothing toward exculpating petitioner for the shooting of Williams. It does not "significantly advance" his claim. See *People v. Savory*, 197 Ill. 2d 203, 213 (2001) (holding that evidence that materially advances a claim need not be exonerating but must significantly advance the claim).

¶ 105    McWilliams's statement to Myles was that he "found out" a year and a half after the shooting that Houston owed a person named Jerrell Butler money from drug sales. Again, the statement is conclusory and merely based on rumor. McWilliams does not explain how he "found out" this information or from whom. Additionally, the statements that he thought Butler "could have been" the shooter and that "they needed to resolve the matter so [petitioner] was the perfect person to blame the murder on" are again vague and conclusory. And we have no idea when Houston owed Butler money as to even be remotely material to any motive for lying about the identity of the shooter.

¶ 106    Furthermore, to the extent that McWilliams claims that he falsely implicated defendant in the shooting, this statement is not material to defendant's innocence because no statement from McWilliams was used in the factual basis for the plea to convict defendant. See *People v. Coleman*, 2013 IL 113307, ¶ 96 (stating that evidence is material when it "is relevant and probative of the petitioner's innocence"). Petitioner's conviction rested on evidence wholly independent of any statement McWilliams may have given to police.

¶ 107    Additionally, Myles's affidavit never mentions the eyewitness Battle. McWilliams told Myles that he went to the police with Barnes and Harmon to make false accounts. There is no new evidence that would suggest that Battle had a motive to lie when he identified petitioner as the shooter under oath before the grand jury. Most importantly, there is no new evidence in Myles's affidavit that undermines Winters's testimony that petitioner confessed to him to being the shooter.

¶ 108    Taking the new affidavits and comparing them with the factual basis for the plea, along with petitioner's admission of guilt at the plea conference, petitioner has not presented sufficient well-pleaded and material evidence to meet the high standard for setting forth a colorable claim of actual innocence following a voluntary, knowing, and intelligent plea.

Nothing in our precedent compels a different result. Accordingly, I would find that the circuit court properly denied petitioner leave to file his successive petition claiming actual innocence.

¶ 109　　　　I respectfully dissent.