NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230942-U

NO. 4-23-0942

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 31, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| CYNTHIA MARIE BAKER, | ) | No. 19CF416 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Jason Chambers, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Zenoff and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, finding the trial court did not err by summarily
dismissing defendant's *pro se* postconviction petition at the first stage of
postconviction proceedings.

¶ 2    Defendant, Cynthia Marie Baker, appeals the summary dismissal of her *pro se*

postconviction petition at the first stage of postconviction proceedings. Defendant argues the trial

court erred by dismissing her petition because it set forth the gist of a claim that counsel was

ineffective for failing to present her alleged history of being domestically abused as evidence in

mitigation during the sentencing hearing. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    Following a jury trial, defendant was found guilty of first degree murder,

aggravated battery of a child, domestic battery, and endangering the life or health of a child for

causing the death of R.R., the eight-year-old daughter of defendant's boyfriend, Richard

Roundtree. We discussed the evidence presented at trial extensively in our order in defendant's

direct appeal. See *People v. Baker*, 2022 IL App (4th) 200637-U, ¶¶ 9-27. We summarize only

the evidence relevant to the disposition of this appeal.

¶ 5    At defendant's trial, the State introduced numerous exhibits, including excerpts of

defendant's text-message conversations with Roundtree over the course of several months

leading up to R.R.'s death. The following text exchange occurred in July 2018:

> "[Defendant]: I love u too but dam I really hate your f*** daughter
>
> [Roundtree]: What happened now babe
>
> [Defendant]: Fighting like grown adults again I swear if she was my kid I would strangle her
>
> [Roundtree]: Dumb a*** Little girl."

In August 2018, Roundtree and defendant discussed the following:

> "[Roundtree]: I have one question for you
>
> [Defendant]: What's the question
>
> [Roundtree]: Would life be better without [R.R.]
>
> [Defendant]: I don't know I don't want to say yes that is your daughter but it always seems to be about her and she doesn't try to fix anything she is old enough to at least try
>
> [Roundtree]: Before her you was happy and now you're not really happy
>
> [Defendant]: Because she is trying to make my life hell u seen it again yesterday
>
> ***

[Defendant]: I could continue to just beat her a*** daily and go about my day but I try and involve u so u now [*sic*]."

During another text exchange in September 2018, Roundtree and defendant spoke about the following:

"[Defendant]: Was [R.R.] still alive when u got home lol

[Roundtree]: Aw baby I love more baby also I kicked [R.R.] out my house

[Defendant]: Lol I could only wish

[Roundtree]: I did she start cryin [*sic*]

[Defendant]: How did u do that? Was she sleeping when u got home

[Roundtree]: Ya in my son room and she lie about eat Cookies until I told her to leave

[Defendant]: I hate [that] little b***

[Roundtree]: I Agree babe

[Defendant]: She just promised and swore to god she was done lying to us today! Tell her I said to do hand stands for an hour I'm done playing her a***

[Roundtree]: Ok well done babe

[Defendant] And she is going to cry about it don't give in stay in her a***

[Roundtree]: I got u baby

* * *

[Defendant]: She will do it for hours tell her her time don't start till she is doing it correctly for an hour straight

[Roundtree]: Ok

[Defendant]: I'm not joking don't let her slack cuz [*sic*] I'm gone

[Roundtree]: I understand babe."

¶ 6    Emergency personnel responded to defendant's residence on January 25, 2019. When they arrived, defendant was waiting at the front door, holding R.R. in her arms. R.R. "was limp at the time" with her "extremities down, head back." Her stomach also appeared "distended, bulging out," and not proportionate to her stature. Despite attempts to clear "a copious amount of emesis within [R.R.'s] airway," she remained unresponsive and apneic, which necessitated CPR. R.R. was subsequently transported to OSF Children's Hospital of Illinois in Peoria (OSF), where she received emergency surgery after a computed tomography scan showed air outside of her bowel but inside her abdomen.

¶ 7    Dr. Charles Aprahamian, a chief surgeon at OSF, testified he observed "blood and stool in [R.R.'s] abdomen" during her surgery. He also saw an injury to the membrane that attaches the small intestine to the abdominal wall and a perforation of R.R.'s colon. Aprahamian had "only ever seen that in blunt abdominal trauma," and a "[s]ignificant" degree of force, such as being struck in the stomach by an adult, would be necessary to cause the injury. Following her surgery, R.R.'s physical condition continued to worsen, and she died on January 26, 2019.

¶ 8    Dr. John Scott Denton, a forensic pathologist of the McLean County Coroner's Office, testified he observed "conservatively *** about 50 different *** patterned scars and marks on [R.R.]'s body" as he conducted her autopsy. He further testified that "on the right side of [R.R.'s] abdomen there was a large healing bruise. It was about four inches in diameter that was full thickness and went all the way through the abdominal wall." There was a similar bruise "in her right groin." Denton also identified an "area of [R.R.'s] intestines," which showed "a shaggy coating of *** peritonitis from inflammation that's on the surface of the bowel, which means her bowel did perforate." According to Denton, R.R.'s "cause of death as demonstrated in

those injuries [was] peritonitis due to intestinal perforation due to blunt trauma of the right side of her abdomen," which was consistent with being "struck in the right lower abdomen by an adult." Denton concluded that "this is child abuse. This is repetitive injuries to a child over numerous *** weeks."

¶ 9 C.B., R.R.'s seven-year-old half-sister, testified defendant used a belt to discipline R.R. and would punish her for "[n]othing." C.B. also recalled seeing defendant kick R.R. in the stomach twice in the living room of the family's residence sometime after Christmas. Defendant was seated "[o]n the big couch" while R.R. sat "[o]n the ground." R.R. was "just sitting" and not misbehaving. According to C.B., defendant kicked R.R. hard enough that she "busted her head on the very top where the TV was." Defendant then "started laughing at [R.R.]" and kicked her in the stomach a second time.

¶ 10 At defendant's sentencing hearing, the State, in aggravation, emphasized defendant's "callousness and complete disregard for [R.R.]'s wellbeing," as well as the "psychological warfare" she waged against the child. In particular, the State argued the string of text messages between defendant and Roundtree "[spoke] for themselves." The State further argued that "the level and nature of harm inflicted upon [R.R.] illustrates just how evil this defendant is." In doing so, the State highlighted "the damage done to [R.R.'s] internal organs" and how "[h]er body literally rotted from the inside, leading to a painful and agonizing death."

¶ 11 In mitigation, defense counsel presented a group exhibit containing 11 character-reference letters written on defendant's behalf. Counsel highlighted defendant's loved ones' perception that she was "considerate and generous with her time," despite being "a single mother of five children" who "juggled working full-time and parenting to be the leader of the family." Defendant was "all about family" and "put[ ] others before herself." Additionally,

counsel emphasized defendant's relative "lack of any criminal history" and argued, "the good things that [defendant]'s done with her life to this point should not be completely discredited and thrown out when *** coming to a decision here today."

¶ 12 Before imposing defendant's sentence, the trial court stated it "considered the trial evidence, the presentence investigation report, the history, character and attitude of the defendant, *** the evidence and arguments, [and] the statement in allocution." The court also stated it had "spent substantial time thinking about this case" and "the sentence in this case" before acknowledging that it had "yet to see a case where the evidence is as distressing *** as this one is." The court continued:

> "Even if I were to accept your position that you did not kick [R.R.] and cause the problem, it still bewilders me how somebody can stand by and observe the abuse that was ongoing of an eight-year-old child. It bewilders me. Nothing that child did, or frankly for that matter, could have done warranted the type of abuse that was inflicted upon her. The demented idea that holding *** cans out while naked and being beaten as some sort of acceptable form of punishment is very troubling to the Court. *** That's not acceptable punishment. It's just pure evil. *** And to videotape all of this is even more alarming to the Court."

Thereafter, the court sentenced defendant to natural life imprisonment.

¶ 13 On direct appeal, defendant argued her trial counsel's failure to more aggressively cross-examine C.B. amounted to ineffective assistance of counsel. She further alleged posttrial counsel rendered ineffective assistance by failing to argue that trial counsel (1) operated under an actual conflict of interest, (2) failed to offer a limiting instruction regarding the testimony of R.R.'s classmate, J.H., and (3) failed to object to the State's use of photographic and video

evidence during its rebuttal closing argument. *Baker*, 2022 IL App (4th) 200637-U, ¶ 47. We ultimately found defendant was not denied the effective assistance of counsel. *Baker*, 2022 IL App (4th) 200637-U, ¶ 82.

¶ 14        Defendant then filed a *pro se* postconviction petition, asserting, among other things, that, "Had trial counsel *** introduced the domestic violence abuse suffered at the hands of *** Roundtree, the Court may have found this to be reason for a lessor [*sic*] sentence." In her affidavit, defendant asserted she informed counsel of her fear of Roundtree and that he would slap her if she refused to follow any of his orders. Defendant claimed Roundtree's orders were to (1) have dinner cooked before he got home from work, (2) discipline R.R., whereby defendant struck R.R. with a belt and made her "hold cans out to her side for long periods of time[ ]," and (3) "perform sexual duties at [Roundtree's] command." However, counsel "told [defendant] not to mention it and he would not because it would appear [she] was playing victim and it would be looked down upon by the courts."

¶ 15        Later, the trial court summarily dismissed defendant's *pro se* postconviction petition, finding it frivolous and patently without merit.

¶ 16        This appeal followed.

¶ 17                                    II. ANALYSIS

¶ 18        On appeal, defendant argues the trial court erred by summarily dismissing her petition at the first stage of postconviction proceedings. Specifically, she asserts her petition set forth the gist of a claim that she was denied the effective assistance of counsel where counsel failed to present evidence of Roundtree's alleged abuse of her as evidence in mitigation during the sentencing hearing.

¶ 19        "The Post-Conviction Hearing Act [(Act)] provides a three-stage procedural mechanism for a criminal defendant to challenge his or her conviction or sentence for violations of federal or state constitutional rights." *People v. Knapp*, 2020 IL 124992, ¶ 43, 181 N.E.3d 875; 725 ILCS 5/122-1 *et seq.* (West 2022)). At the first stage of postconviction proceedings, the trial court may summarily dismiss a petition upon a determination it is frivolous or patently without merit. *People v. Hodges*, 234 Ill. 2d 1, 10, 912 N.E.2d 1204, 1208-09 (2009). A *pro se* petition for postconviction relief is frivolous or patently without merit only when "the petition has no arguable basis either in law or in fact or when the petition relies on an indisputably meritless legal theory or a fanciful factual allegation." (Internal quotation marks omitted.) *Knapp*, 2020 IL 124992, ¶ 45. "For purposes of summary dismissal, a meritless legal theory is one completely contradicted by the record, while fanciful factual allegations may be fantastic or delusional." (Internal quotation marks omitted.) *Knapp*, 2020 IL 124992, ¶ 45. "The summary dismissal of a postconviction petition is reviewed *de novo*." *People v. Tate*, 2012 IL 112214, ¶ 10, 980 N.E.2d 1100.

¶ 20        A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29, 89 N.E.3d 366. To prevail, "a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Cathey*, 2012 IL 111746, ¶ 23, 965 N.E.2d 1109 (quoting *Strickland*, 466 U.S. at 694). At the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance of counsel "should not be summarily dismissed if (1) it is arguable that counsel's performance fell below an objective standard of

reasonableness and (2) it is arguable that the petitioner was prejudiced." *Knapp*, 2020 IL 124992, ¶ 46.

¶ 21 Initially, the State contends defendant's claim of ineffective assistance of counsel is forfeited because she could have raised the issue on direct appeal. While we agree with the State that defendant arguably could have raised the issue on direct appeal, the procedural default rules "are relaxed *** where the facts relating to the issue of [counsel's alleged] incompetency do not appear on the face of the record." *People v. Eddmonds*, 143 Ill. 2d 501, 528, 578 N.E.2d 952, 964 (1991). A claim based on what counsel should have done may rely on proof that is not contained in the record due to counsel's allegedly deficient representation. *Tate*, 2012 IL 112214, ¶ 14. Thus, procedural default will not preclude a defendant from raising that claim on collateral review. *Tate*, 2012 IL 112214, ¶ 14.

¶ 22 Here, defendant asserted in her petition that counsel was ineffective for failing to present evidence of Roundtree's alleged abuse of her as evidence in mitigation during the sentencing hearing. As the State acknowledges in its appellee's brief, the record is "silent" regarding Roundtree's alleged abuse of defendant and counsel's awareness of it. Thus, in this situation, forfeiture does not preclude defendant's ineffective assistance claim because it is based on information not found in the trial record and on what counsel should have done, not what counsel did. See *Tate*, 2012 IL 112214, ¶ 14.

¶ 23 Still, defendant failed to state the gist of a claim that she was denied the effective assistance of counsel. After reviewing the record, we conclude defendant was not even arguably prejudiced by the alleged deficiency in counsel's representation. The evidence in aggravation was staggering. At the sentencing hearing, the State emphasized defendant's "callousness and complete disregard for [R.R.]'s wellbeing," as well as the "psychological warfare" she waged

against R.R. The string of text messages—where defendant voiced her hatred for R.R. and ordered Roundtree to have R.R. do handstands "for hours"—contradicts any assertion defendant abused R.R. only out of fear of disobeying Roundtree.

¶ 24        Not only that, the trial court stated it "considered the trial evidence, the presentence investigation report, the history, character and attitude of the defendant, *** the evidence and arguments, [and] the statement in allocution." The court also stated it had "spent substantial time thinking about this case," "the sentence in this case," and it had "yet to see a case where the evidence is as distressing *** as this one is."

¶ 25        At trial, the court heard C.B. describe how defendant used a belt to discipline R.R. and punished her for "[n]othing." C.B. also recalled seeing defendant kick R.R. in the stomach twice in the family's living room. Defendant was seated "[o]n the big couch," while R.R. sat "[o]n the ground." C.B. testified R.R. was "just sitting" and not misbehaving. According to C.B., defendant kicked R.R. hard enough that she "busted her head on the very top where the TV was." Defendant then "started laughing at [R.R.]" and kicked her in the stomach a second time.

¶ 26        Dr. Aprahamian testified he observed "blood and stool in [R.R.'s] abdomen" during her surgery. He also saw an injury to the membrane that attaches the small intestine to the abdominal wall and a perforation of R.R.'s colon. Aprahamian had "only ever seen that in blunt abdominal trauma," and a "[s]ignificant" degree of force, such as being struck in the stomach by an adult, would be necessary to cause the injury."

¶ 27        The trial court also listened as Dr. Denton testified about the approximately "50 different *** patterned scars and marks on [R.R.'s] body" he saw during her autopsy. "[O]n the right side of her abdomen there was a large healing bruise. It was about four inches in diameter that was full thickness and went all the way through the abdominal wall." There was a similar

bruise "in her right groin." Denton ultimately concluded R.R.'s cause of death was "peritonitis due to intestinal perforation due to blunt trauma of the right side of her abdomen," which was consistent with being "struck in the right lower abdomen by an adult." He further concluded that "this is child abuse. This is repetitive injuries to a child over numerous *** weeks."

¶ 28 Finally, even if it accepted defendant's assertion that she did not kick R.R. and cause the injuries, the trial court expressed its bewilderment at how someone could "stand by and observe the abuse that was ongoing of an eight-year-old child." In the court's opinion, "Nothing that child did, or frankly for that matter, could have done warranted the type of abuse that was inflicted upon her." The court also found the "demented idea" of "holding *** cans out while naked and being beaten as some sort of acceptable form of punishment" to be "very troubling" and "pure evil. And to videotape all of this [was] even more alarming to the Court."

¶ 29 Given "the damage done to [R.R.'s] internal organs," how "[h]er body literally rotted from the inside," and the "painful and agonizing" way in which she died, it is inarguable that defendant's claim of ineffective assistance could satisfy *Strickland*'s prejudice prong. In other words, no reasonable probability exists that, but for counsel's failure to present evidence of Roundtree's alleged abuse of defendant as evidence in mitigation, the trial court would have imposed a lesser sentence. Thus, defendant failed to state the gist of a claim that her counsel was ineffective, and the court did not err in summarily dismissing her postconviction petition. See *Knapp*, 2020 IL 124992, ¶ 46.

¶ 30 III. CONCLUSION

¶ 31 For all these reasons, we affirm the trial court's judgment.

¶ 32 Affirmed.